**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Jesus Razo, ) | CV 08-1106-PHX-NVW (JM) |
| Petitioner, ) | **REPORT AND RECOMMENDATION** |
| v. ) | |
| Warden Blair, et al., ) | |
| Respondents. ) | |

Pending before the Court is Petitioner's Petition for Writ of Habeas Corpus [Docket No. 1] filed under 28 U.S.C. §2254. In accordance with the Rules of Practice of the United States District Court for the District of Arizona and 28 U.S.C. § 636(b)(1), this matter was referred to the Magistrate Judge for report and recommendation. As explained below, the Magistrate Judge recommends that the District Court, after an independent review of the record, deny and dismiss the Petition with prejudice.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Trial and Sentencing

By Indictment filed March 31, 2003, the State charged Petitioner with committing the following five offenses on December 9, 2002: the manslaughter of Veronica Armenta, a class 2 dangerous felony (Count 1); the aggravated assaults of Sonia Diaz and Rosie Guerrero, class 3 dangerous felonies (Counts 2 and 3, respectively); the endangerment of Victoria Armenta, a class 6 dangerous felony (Count 4); and leaving the scene of a fatal injury accident, a class 3 felony (Count 5). (Ex. A, Item 1.) The facts underlying the charges were summarized by the Arizona Court of Appeals as follows:

> On the date of the incident, a vehicle insured by [Petitioner's] parents and driven by [Petitioner] approached a school bus from the rear at a high rate of speed. The bus was stopped in the far right of the three westbound lanes, with its flashing lights operating and its stop sign deployed. A small

white car was stopped near the bus in the far left of the westbound lanes, waiting as the bus unloaded students.

As [Petitioner's] vehicle approached the bus, the sole passenger told [Petitioner] to look out because he believed that they might crash. In an effort to avoid the bus, [Petitioner] attempted to maneuver into the middle lane. However, [Petitioner] lost control of the vehicle and struck the rear of the white car, "overroad" the car, became airborne and flipped over. [Petitioner's] vehicle came to rest on its left side in front of the school bus. The impact spun the white car 180 degrees and knocked it approximately forty feet form the point of impact. It was determined that [Petitioner's] vehicle was traveling at a minimum of fifty-two miles per hour at the time of impact and may have been slowing down from a higher speed. The speed limit was forty-five miles per hour.

After the vehicles came to a rest, [Petitioner] and the passenger climbed out of the passenger side door and fled the scene on foot. The passenger fled because he had an outstanding warrant. Witnesses who followed [Petitioner] caught up with him and persuaded him to return. When [Petitioner] was unable to climb over a fence on his return, he waited at that location for police officers to arrive. He was ultimately taken away by ambulance.

The white car contained four persons - two women and two young girls who were the driver's daughters. The two women were injured, as was the driver's five-year-old daughter, who died of her injuries. The driver's other daughter sustained only minor injuries.

Evidence indicated that [Petitioner] had used marijuana one to two hours prior to the incident and that he was impaired by marijuana at the time of the incident. Drug paraphernalia associated with marijuana use was found in [Petitioner's] vehicle, and [Petitioner] smelled of marijuana.

(Ex. O, pp. 1-4.)

The jury found Petitioner guilty of Counts 1, 2, 3 and 4, but acquitted him on Count 5 (leaving the scene of a fatal injury accident). (Ex. A, Items 89-95; Exhibit B, Item 97; Exhibit J, pp. 2-4.) On January 28, 2005, the trial court imposed four presumptive prison terms: 10 ½ years for manslaughter (Count 1), 7 ½ years for aggravated assault (Count 2), 7 ½ years for aggravated assault (Count 3), and 2 ¼ years for endangerment (Count 4). (Ex. K, pp. 34-35.) The sentences for Count 1 and Count 2 were ordered to be served consecutively, and the sentences for Count 3 and Count 4 were ordered to run concurrently with the sentence on Count 2, which resulted in a total of 18 years imprisonment. (*Id.*)

**B.     Direct Appeal**

On September 26, 2005, Petitioner filed a counseled brief in the Arizona Court of Appeals raising the following claims:

1.     Petitioner was subjected to a warrantless arrest without probable cause.

2.     The identification procedure used by law enforcement was constitutionally flawed because, as a single person "lineup," it was unduly suggestive, and violated Petitioner's right to counsel.

3.     The in-court identification of Petitioner by Marion Hawkins was not reliable.

4.     The improper identification procedure used by law enforcement tainted the subsequent arrest and search warrant obtained by the Glendale Police Department.

5.     The testimony of the State's drug recognition examiner and the testimony of the State's toxicology expert were inadmissible as fruits of the *Miranda* violation.

6.     Petitioner's statements to the drug recognition examiner and all the police officers were not voluntary and should have been suppressed.

7.     Petitioner's urine sample was obtained illegally and should have been suppressed.

8.     The sentencing hearing violated Petitioner's constitutional rights to due process and a fair trial.

9.     The trial court permitted prohibited victim sentencing recommendations.

10.    Petitioner's consecutive sentences violated double jeopardy.

(Ex. L.)

On December 23, 2005, the State filed its answering brief, wherein it argued that Petitioner's convictions and sentences should be affirmed because none of his arguments warranted reversal. (Ex. M.) On January 26, 2006, Petitioner filed his reply brief. (Ex. N.) On May 18, 2006, the Arizona Court of Appeals unanimously affirmed Petitioner's convictions and sentences in an unpublished Memorandum Decision. (Ex. O.)

On June 19, 2006, Petitioner filed with the Arizona Supreme Court a petition for

review which raised the following arguments: (1) the police lacked probable cause to arrest Petitioner; (2) the pretrial identification was unduly suggestive and occurred in the absence of counsel: (3) Petitioner urine sample was taken in violation of A.R.S. § 28-1388(E) and *State v. Estrada,* 209 Ariz. 297, 100 P.3d 452 (App. 2004); (4) the police used information gained during an unwarned interrogation in violation of *Miranda* and *Missouri v. Siebert*, 542 U.S. 600 (2004); (5) Petitioner's post-arrest statements to the drug-recognition expert were involuntary, in light of *Mincey v. Arizona*, 437 U.S. 385 (1978); and (6) Petitioner's sentencing hearing was defective because the trial court heard the testimony of a victim and a non-victim (Hawkins) and admitted "previously suppressed evidence regarding gang affiliations and tattoos to be made." (Ex. P.) On December 13, 2006, the Arizona Supreme Court summarily denied review. (Ex. Q.)

### C.     Petition for Post-Conviction Relief

On January 5, 2007, Petitioner, who was represented by counsel, filed a notice of post-conviction relief ("PCR"). (Ex. R.) On January 8, 2007, Petitioner's counsel filed a PCR petition raising one claim: the trial court's minute entry of the sentencing hearing incorrectly reflected a cumulative sentence of 25.5. years, instead of the 18-year sentence that the trial court had pronounced at the sentencing hearing. (Ex. S.) The State concurred with Petitioner's assertion of error. (Ex. T.) Accordingly, the trial court, on June 6, 2007, issued a minute entry order pursuant to Arizona Rule of Criminal Procedure 24.4 correcting Petitioner's sentence. (Ex. U.)

### D.     Petition for Writ of Habeas Corpus

In the Petition now before the Court, Petitioner has alleged the following grounds for relief:

> I.     Petitioner was subjected to a warrantless arrest without probable cause in violation of the Fourth Amendment.
>
> II.    Petitioner was subjected to: (1) an unduly suggestive out of court identification in a one main line-up in violation of the Sixth Amendment; (2) deprived of counsel at a pre-trial identification procedure; and (3) subjected to an improper in court identification which was tainted by the improper pre-trial identification.

- 4 -

III.   Petitioner's statements to the drug recognition examiner Sergeant Stephens were not voluntarily made.

IV.   Petitioner's Fourth Amendment rights were violated when the officers obtained a urine sample without a warrant.

V.   Petitioner's due process and Sixth Amendment rights were violated during the sentencing hearing when the trial court improperly permitted: (1) non-victim Marion Hawkins (the bus driver) to provide victim impact testimony; (2) victims and Hawkins to recommend that the maximum sentence be imposed; (3) untrue hearsay testimony from victims that; and (4) hearsay testimony from officers regarding Petitioner's gang affiliations.

VI.   Petitioner was subjected to double jeopardy through the imposition of consecutive sentences for crimes that arose from a single act.

*Petition,* pp. 5-10.

## II.   LEGAL DISCUSSION

### A.   Exhaustion

A state prisoner must exhaust the available state remedies before a federal court may consider the merits of his habeas corpus petition. *See* 28 U.S.C. § 2254(b)(1)(A); *Nino v. Galaza,* 183 F.3d 1003, 1004 (9th Cir.1999). Exhaustion occurs either when a claim has been fairly presented to the highest state court, *Picard v. Connor*, 404 U.S. 270, 275 (1971), or by establishing that a claim has been procedurally defaulted and that no state remedies remain available, *Reed v. Ross*, 468 U.S. 1, 11 (1984).

Exhaustion requires that a habeas petitioner present the substance of his claims to the state courts in order to give them a "fair opportunity to act" upon these claims. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999). A claim has been "fairly presented" if the petitioner has described the operative facts and legal theories on which the claim is based. *Picard v. Connor*, 404 U.S. 270, 277-78 (1971); *Rice v. Wood*, 44 F.3d 1396, 1403 (9th Cir. 1995). The operative facts must be presented in the appropriate context to satisfy the exhaustion requirement. The fair presentation requirement is not satisfied, for example, when a claim is presented in state court in a procedural context in which its merits will not

be considered in the absence of special circumstances. *Castille*, 489 U.S. at 351, 109 S.Ct. at 1060. An exact correlation of the claims in both state and federal court is not required. *Rice,* 44 F.3d at 1403. The substance of the federal claim must have been fairly presented to the state courts. *Chacon v. Wood*, 36 F.3d 1459, 1467 (9th Cir. 1994) (citations omitted).

A petitioner may also exhaust his claims by either showing that a state court found his claims defaulted on procedural grounds or, if he never presented his claims in any forum, that no state remedies remain available to him. *See Jackson v. Cupp*, 693 F.2d 867, 869 (9th Cir. 1982). "To exhaust one's state court remedies in Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-conviction relief pursuant to Rule 32," *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994), and then present his claims to the Arizona Court of Appeals. *See Swoopes v. Sublett,* 196 F.3d 1008, 1010 (9th Cir. 1999).

In this case, Respondents contend that Petitioner failed to exhaust Ground VI and portions of Grounds II and V. With the exception of a portion of Ground V, which is addressed below, Respondents contend, contrary to what the Ninth Circuit held in *Swoopes*, that Petitioner was obligated to present his claims to the Arizona Supreme Court and, because he failed to do so, he did not exhaust his claims as required by 28 U.S.C. § 2254(c). Specifically, Respondents argue that *Swoopes* was wrongly decided and is no longer good law and that under *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), Petitioner was also required to petition the Arizona Supreme Court to review his claims. This argument has been addressed and rejected a number of times in this district and the Ninth Circuit has recognized that *Swoopes* survived the *Baldwin* decision. *See Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005). As Respondents cite no other basis for finding that these claims were not fairly presented in the Arizona courts, there is no basis for finding that the claims were not exhausted.

In relation to the remaining claim, the portion of Ground V where Petitioner contends that the victims made "false statements" about him that were "not true," *Petition*, p. 9, Respondents contend that the claim was never presented as a federal constitutional claim in

the Arizona courts. In reading the Petition and the Petitioner's brief on direct appeal, Petitioner appears to ascribe the "false" and "untrue" statements to Officer Hammer. In the Petition, the allegations of false statements appear after Petitioner's complaints about the testimony of the victims and the bus driver, Marion Hawkins, but before his complaints about the testimony of Officer Hammer regarding his gang affiliation. *Petition*, p. 9. In relation to the victim testimony and that of Mr. Hawkins, Petitioner does not allege that it was false or untrue, but that the testimony of Mr. Hawkins was improper as he was not a "victim" under Arizona law, and that the victims were improperly allowed to recommend a harsh sentence.

It is the testimony of Officer Hammer that is described in the Petition as "misleading and inaccurate" and thus appears to be the testimony about which Petitioner is complaining when he describes "false" and "untrue" testimony. Petitioner extensively challenged this testimony on direct appeal. Exhibit L, pp. 55-57. In doing so, Petitioner described the admission of the testimony as a "violation of due process and the Sixth Amendment rights to a fair trial." *Id.*, p. 52. He also cited federal authority, *Payne v. Tennessee*, 501 U.S. 808 (1991), and *Darden v. Wainright*, 477 U.S. 168 (1986), which identified the legal standards that he urged the Arizona court to apply. Accordingly, this portion of Petitioner's Ground V is also exhausted.

## B.    Merits

Under the AEDPA, a federal court "shall not" grant habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the state decision was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). *See Williams v. Taylor*, 120 S.Ct. 1495 (2000). A state court's decision can be "contrary to" federal law either (1) if it fails to apply the correct controlling authority, or (2) if it applies the controlling authority to a case involving facts "materially indistinguishable" from those in a controlling case, but nonetheless reaches a different result.

*Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000). In determining whether a state court decision is contrary to federal law, the court must examine the last reasoned decision of a state court and the basis of the state court's judgment. *Packer v. Hill*, 277 F.3d 1092, 1101 (9th Cir. 2002). A state court's decision can be an unreasonable application of federal law either (1) if it correctly identifies the governing legal principle but applies it to a new set of facts in a way that is objectively unreasonable, or (2) if it extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Hernandez v. Small*, 282 F.3d 1132 (9th Cir. 2002).

### 1. Grounds I and IV

In both Grounds I and IV, Petitioner contends that his Fourth Amendment rights were violated. Specifically, in Ground I, Petitioner asserts that he was subjected to a warrantless arrest without probable cause, and in Ground IV he alleges his urine sample was obtained without a warrant. *Petition*, pp. 5 & 8. As Respondents contend, these claims are not cognizable on habeas review.

A federal district court cannot grant habeas corpus relief based on an alleged Fourth Amendment violation if the state court has provided the petitioner with a "full and fair opportunity to litigate" the Fourth Amendment issue. *Stone v. Powell,* 428 U.S. 465, 494 (1976); *Woolery v. Arvan,* 8 F.3d 1325, 1326 (9th Cir. 1993); *Hernandez v. City of Los Angeles,* 624 F.2d 935, 937 n. 3 (9th Cir. 1980) (stating that a "fourth amendment claim is not cognizable as a basis for federal habeas relief, where the state has provided an opportunity for full and fair litigation of the claim"). In *Stone*, the Supreme Court noted that the purpose behind the exclusionary rule is to deter law enforcement from future unconstitutional conduct by removing an incentive to disregard the Fourth Amendment. *Stone,* 428 U.S. at 492. However, the Court also recognized that excluding evidence that is not untrustworthy creates a windfall to the defendant at a substantial societal cost. *See Stone,* 428 U.S. at 489-90; *Woolery,* 8 F.3d at 1327-28. The Supreme Court acknowledged in *Stone,* 428 U.S. at 493, that permitting petitioners to raise search and seizure claims in a writ of habeas corpus would not significantly deter Fourth Amendment violations. Thus, the Court concluded that

petitioner should not be permitted to raise search and seizure claims where the State provided the petitioners an opportunity for full and fair litigation of their claims. *Id.* at 493-494. The Ninth Circuit, relying on *Stone*, explained that:

> [I]n cases where a petitioner's Fourth Amendment claim has been adequately litigated in state court, enforcing the exclusionary rule through writs of habeas corpus would not further the deterrent and educative purposes of the rule to an extent sufficient to counter the negative effect such a policy would have on the interests of judicial efficiency, comity and federalism.

*Woolery,* 8 F.3d at 1326 (citing *Stone,* 428 U.S. at 493-494);see also *Withrow v. Williams,* 507 U.S. 680 (1993) (stating that *Stone's* limitation on habeas relief rested on prudential concerns, namely "the costs of applying the exclusionary rule on collateral review outweighed any potential advantage to be gained by applying it there"). Thus, the only Fourth Amendment issue properly addressed by this Court is whether Petitioner had a fair opportunity to litigate his claims.

The record reflects that Petitioner did move in the trial court to suppress the urine sample evidence. (Ex. A, Item 21.) Two witnesses and Petitioner testified at the hearing (Ex. B, Item 65; Ex. C, pp. 4-32.) The trial court denied the motion and allowed the State to present the urine evidence in its case in chief. (Ex. C, pp. 31-32.) Petitioner also raised the claim on direct appeal. (Ex. L, pp. 46-51.) The Arizona Court of Appeals found no error:

> Viewed in the light most favorable to sustaining the trial court's ruling, the evidence introduced at the suppression hearing established that one of the emergency room doctors treating defendant ordered that a sample of his urine be obtained for the hospital. There is no evidence that this sample was sought for any reason other than medical purposes. Further, there is no evidence that defendant refused or sought to refuse medical treatment, as in the case relied upon by defendant, *State v. Estrada*, 209 Ariz. 287, 100 P.2d 452 (App. 2004). The order for the urine sample was relayed to defendant by a nurse. The nurse, not a police officer, asked defendant for the sample. Defendant was not threatened with criminal charges if he refused to provide a sample. By the time the nurse asked Defendant for the sample, defendant was suspected of driving while impaired. As defendant urinated into a cup, a police officer stood behind defendant to make sure defendant did not place anything but his urine into the cup. As the officer did so, the nurse stood next to the officer but on the other side of a curtain. When defendant was finished, the officer took the cup

> from defendant and immediately handed it to the nurse. A
> portion of the sample was later provided to law enforcement
> personnel.

(Ex. O, pp. 20-21.) Based on these factual conclusions, the court concluded that "the evidence introduced at the suppression hearing was sufficient to establish that the urine sample was obtained in compliance with the provisions of A.R.S. § 28-1388(E)," and found no error. The claim was then raised in Petitioner's petition for review by the Arizona Supreme Court, which was subsequently denied. (Exs. P & Q.) Based on the history of this claim, it is apparent that Petitioner, who does not argue otherwise, was provided a full and fair opportunity to litigate the claim. Accordingly, federal relief is unavailable. *See Ortiz-Sandoval v. Gomez,* 81 F.3d 891, 899 (9th Cir.1996) (holding that the relevant inquiry is "whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided").

In Ground I, Petitioner claims he was subjected to a warrantless arrest without probable cause in violation of the Fourth Amendment. This claim was first raised by Petitioner in his opening brief on direct appeal. (Ex. L, p. 19.) Despite his failure to raise the claim in the trial court, the Court of Appeals reviewed the claim for fundamental error and found none. (Ex. O, pp. 4-8.) Petitioner then included the claim in his petition for review by the Arizona Supreme Court. (Ex. P, pp. 1-2, 8-9.) As was the case with Ground IV, the record establishes, and Petitioner does not assert otherwise, that he was provided the opportunity to litigate this claim in the state courts and that the claim was addressed when raised. *See Ortiz-Sandoval,* 81 F.3d at 899 (9th Cir.1996) (holding that the relevant inquiry is "whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided"). This claim does not provide a basis for habeas relief.

### 2.    Ground II

Petitioner's first claim under Ground II is that he was subjected to an unduly suggestive out of court identification in a one man line-up in violation of the Sixth Amendment. The last reasoned decision in the state courts came from the Arizona Court of

- 10 -

Appeals in Petitioner's direct appeal.  Under the habeas statute, this Court must determine if the Court of Appeals applied the correct legal standard and made a reasonable determination of the facts based on the evidence presented.  28 U.S.C. § 2254(d).  As discussed below, the state court satisfied both these considerations.

The Court of Appeals initially presented the applicable legal standard by concurring with the trial court's assessment that "[a] 'one-man show-up' is inherently suggestive." (Ex. O, p. 9, *quoting State v Williams*, 144 Ariz. 433, 439, 698 P.2d 678, 684 (1985).)  The court then noted, however, that "a show-up identification is admissible if the identification is reliable," and cited five factors to consider in evaluating reliability:

> 1.  The witness' opportunity to view the defendant at the time to the offense;
>
> 2.  The witness' degree of attention;
>
> 3.  The accuracy of any prior description of the defendant by the witness;
>
> 4.  The witness' level of certainty at the identification; and
>
> 5.  The length of time between the crime and the identification.

(*Id., citing Williams*, 144 Ariz. At 440-41, 698 P.2d at 685-686.)

A review of federal authority addressing the issue establishes that the Court of Appeals applied the correct legal standards.   Just as the state court concluded, an identification procedure is impermissibly suggestive when it emphasizes the focus upon a single individual thereby increasing the likelihood of misidentification. *See United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985).  However, to prevail on habeas review, a petitioner must show that the identification procedure used was ""'so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.'"" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995).  The Supreme Court has identified the factors to be considered when determining the reliability of an identification procedure, and they are the same as those identified by the Arizona Court of Appeals.   *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (identifying same five factors as those identified in *State*

*v Williams*, 144 Ariz. 433, 439, 698 P.2d 678, 684 (1985)).  Thus, the Court of Appeals applied the correct legal standard.

The Court of Appeals determination of the facts in this case was not only reasonable, but hardly questionable.  In finding that identification sufficiently reliable, the court reasoned as follows:

> In this case, the pretrial identification was made by the bus driver.  The bus driver observed defendant and his vehicle in the large left side rear view mirror of the bus as the defendant approached the bus from the rear.  He also observed the defendant directly as he passed by the bus.  The bus driver was able to observe two people in the vehicle. He recognized the defendant as the "heavy set" driver and also saw a "skinny" passenger. [FN 3: It was later established that the passenger weighed 132 pounds and the defendant weighted in the area of 250 pounds.] The bus driver could see defendant's face, and noted the "fatness" of his cheeks and his dark hair.  The bus driver also observed defendant as he stood in front of the bus shortly before the fled the scene.  The bus driver estimated that he observed defendant for five to ten seconds, but stated that "it seemed like forever . . . ."  The bus driver testified that defendant's face was "imprinted" in his memory.
>
> After the incident, an officer drove the bus driver to the hospital.  The bus driver was told only that he was being taken to the hospital to see if someone there could have been involved in the accident.  Once he arrived, the bus driver was told that the person he would observe may or may not be the person he saw at the scene, and that he may or may not be wearing the same clothes.  When the bus driver first observed defendant from the hallway outside his treatment room, defendant was covered with a sheet up to his neck so that only his head was visible.  When the bus driver observed defendant, he spontaneously stated that the was positive defendant was the driver and did so without hesitation.  The bus driver then described defendant's jersey. An officer then went into the room and pulled down the sheet to reveal defendant's black jersey with yellow numbers.  The bus driver then stated that defendant was "definitely the driver."  The bus driver did not see any handcuffs.

(Ex. O, pp. 10-11.)

A review of the record establishes that the testimony of the bus driver, Marion Hawkins, was entirely consistent with the factual findings of the Arizona Court of Appeals. Mr. Hawkins testified that he was driven by officers to the hospital and then told "to come over and look at someone," and to "see if you recognize him."  (Ex. C., p. 47.)  He said he then "walked into the room and . . . recognized the driver of the vehicle."  (*Id*., pp. 47-48.)

He was then asked if he was positive, and stated that "I am positive that's the driver of the vehicle." (*Id.*, p. 48.) He was then thanked and he left. (*Id.*) On cross-examination, Mr. Hawkins certainty was not shaken and he testified that "when you see something like this, it is a face that you don't forget. It is kind of imprinted." (*Id.*) On re-direct examination, Mr. Hawkins described Petitioner as wearing "blue baggie pants" and a "dark colored jersey" with "yellow numbers on it" when he saw him at the scene of the accident. (*Id.*, p. 54.) He was then asked what Petitioner was wearing when officers at the hospital removed the sheet that was covering Petitioner's clothing, and he stated, "He was wearing that jersey." (*Id.*)

In light of Mr. Hawkins' testimony, the Arizona Court of Appeal reasonably determined that there was no reasonable likelihood of mistaken identification. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972) ("It is, first of all, apparent that the primary evil to be avoided is a very substantial likelihood of irreparable misidentification.") (internal quotations omitted). As such, the decision was consistent with federal law and habeas relief is unavailable.

Petitioner's next subclaim in Ground II is that he was deprived of counsel during the identification procedure conducted at the hospital. Addressing this claim, the Court of Appeals concluded that, "[b]ecause criminal proceedings had not been initiated, defendant was not entitled to counsel. *State v. Tresize*, 127 Ariz. 571, 575, 623 P.2d 1, 5 (1980)." (Ex. O, pp. 11-12.) The court did not err in reaching this conclusion. In *Kirby v. Illinois*, 406 U.S. 682 (1972), the United States Supreme Court refused to extend the Sixth Amendment right to counsel to pre-indictment identification. The Court explained that a defendant's Sixth Amendment right to counsel attaches only at or after the time that adversarial proceedings have been formally initiated. *Id.* at 688-89. Here, the identification at the hospital occurred on December 9, 2003, and proceedings were not formally initiated against Petitioner until March 31, 2004, when he was indicted. (Ex. A, Item 1; Ex. C., pp. 33, 39 & 46.) Just as the State court determined, Petitioner was not entitled to counsel pre-indictment and he is therefore not entitled to habeas relief on this claim.

In the third portion of Ground II, Petitioner contends that the in-court identification

was "tainted by the improper pre-trial identification where counsel was required . . . ." *Petition*, p. 6. As discussed above, the Arizona Court of Appeals' determination that Petitioner was not subjected to improper pre-trial identification and was not entitled to counsel were neither contrary to, nor an unreasonable application of federal law. As such, those assertions do not provide a basis for finding that the in-court identification was tainted by those assertedly improper events. Petitioner is not entitled to relief on this claim.

### 3.     Ground III

Petitioner next claims that his statements to the drug recognition examiner ("DRE"), Sergeant Stephens, were involuntary. This is the case, Petitioner contends because, even though he had been administered his *Miranda* warning, he had been in the presence of police officers for about four hours, he had not had anything to eat or drink, he was in severe pain due to the accident, he was heavily medicated, and he had already been subjected to a non-*Mirandized* interrogation which exceed two hours in duration during which time he was handcuffed. *Petition*, p. 7.

In concluding that Petitioner's post-*Miranda* statements were voluntary, the Arizona Court of Appeals provided the following evaluation of the claim:

> "To determine the voluntariness of a statement, the appropriate inquiry is whether, under the totality of the circumstances, the statement was the product of coercive police tactics." *State v. Lee*, 189 Ariz. 590, 601, 944 P.2d 1204, 1215 (1997). The critical element in the inquiry is whether police conduct constituted overreaching. *State v. Poyson*, 198 Ariz. 70, 75, ¶ 10, 7 P.2d 79, 84 (2000). Our ultimate determination is whether Defendant's will was overborne. *See Dickerson v. U.S.*, 530 U.S. 428, 434 (2000). An additional factor to be considered in cases where the suspect is under the influence of drugs is whether the drugs rendered the suspect unable to understand the meaning of his statements. *State v. Clabourne*, 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984). As previously noted above, while we consider only the facts presented at the suppression hearing and review those facts in the light most favorable to sustaining the ruling on a motion to suppress, we review *de novo* the legal question of whether defendant's constitutional rights were violated.
>
> We find no error in the determination that the defendant's post-*Miranda* statements were voluntary. Regarding the medications administered at the hospital, the officers were aware of the specific medications given to defendant, the defendant

- 14 -

exhibited no signs that the medications affected his ability to communicate. Regarding the "head injury," this actually consisted of a minor injury described as a "scratch" and/or a "scrape" which also did not affect defendant's ability to communicate. There is nothing in the record to indicate that defendant received any treatment for this or any other head injury. While defendant did complain of back pain, there is nothing to indicate this affected the voluntariness of his statements.

Regarding defendant's other allegations, as noted above, the pre-*Miranda* "two hour interrogation" consisted of the question "what happened" surrounded by small talk. There is nothing in the record to suggest that this was in any way coercive. Regarding the allegation that defendant's hospital gown was "yanked up" and that he was deprived food and water, there is simply nothing in the record to support either allegation. Finally, in regard to the alleged confinement, other than the fact that defendant was in police custody, there is nothing in the record to indicate this "confinement" was in any way coercive, unduly or otherwise, or even uncomfortable.

(Ex. O, pp. 17-18.) After contrasting the facts presented by Petitioner from those presented in *Mincey v. Arizona*, 437 U.S. 385 (1978), the appeals court concluded:

This case is not analogous to *Mincey*. There is no evidence of coercive police tactics or overreaching. There is no evidence that defendant's medical condition or the medications he had been given in any way affected his ability to communicate or rendered him unable to understand the meaning of his statements. There is nothing in the record to indicate the defendant's will was overborne. We find no error in the determination that defendant's post-*Miranda* statements to police officers were voluntary.

(Ex. O, p. 19.)

Petitioner takes no issue with the law applied by the Arizona Court of Appeals. The mixture of Arizona and federal authority applied in the decision resulted in a standard consistent with Supreme Court precedent and the section 2254 requirement to apply that law. As Respondents indicate, the quoted passage from *Lee* is derived from *Colorado v. Connelly*, 479 U.S. 157 (1986), where the Court explained that "[c]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id*. at 167. The appeals court also cited *Dickerson v. U.S.,* 530 U.S. 428 (2000), identifying the ultimate determination as whether the defendant's will was overborne. *Id*. at 434.

- 15 -

Petitioner's contention is that the Court of Appeals, in finding his statements voluntary, unreasonably applied the law to the facts. He complains that his gown was "yanked up" and that he was never offered food or water. The Court of Appeals found nothing in the record to support these claims and Petitioner has offered nothing other than his allegations. Petitioner has attached to his Reply medical records reflecting his treatment while at the hospital. The records contain no indication of whether he was given food or water; however, the records do show he was being tended to: he was evaluated, given x-rays and medicated for his pain complaints.[1] Given the documentation of Petitioner's treatment at the hospital, it certainly was not unreasonable for the Court of Appeals to conclude that Petitioner's claims of mistreatment did not support his claim of involuntariness.

The Court of Appeals also dismissed any notion that Petitioner's pre-*Miranda* statements showed coercion and noted that the claimed two hour interrogation "consisted of the question 'what happened' surrounded by small talk." (Ex. O, p. 18.) Petitioner has not identified any additional information, in the record or otherwise, that would cause this Court to find the Court of Appeals' determination on this issue was unreasonable.

Petitioner's most substantial basis for claiming coercion is that he was suffering the effects of the accident and was under the influence of pain medication "commonly known to cause confusion, extreme fatigue, disorientation and impaired judgment." *Petition*, p. 7. In his brief to the Arizona Court of Appeals and in his reply in this case, Petitioner likens his condition to that of the defendant in *Mincey v. Arizona*, 437 U.S. 385 (1978). In rejecting this argument, the Arizona Court of Appeals distinguished *Mincey* as follows:

> In *Mincey,* a suspect's statements to a police officer while in the hospital were found to be involuntary under the circumstances. However, the facts of *Mincey* are distinguishable from the instant case. Mincey had suffered injuries serious enough to require hospitalization for nearly a month. He was interrogated while in intensive care, "encumbered by tubes, needles, and a breathing apparatus" used for "more critical" patients. He

---

[1]In fact, Petitioner testified at the suppression hearing that it was Officer Aldridge who went and spoke to the doctor or nurses about his pain and was then given medication. (Ex. O, pp. 101-102.)

> complained of "unbearable" pain to the officer. He displayed confusion and the inability to think clearly, and some of his responses were incoherent. Even thought Mincey repeatedly asked the officer to leave him alone, the officer stopped the interrogation only when Mincey lost consciousness or when he was given medical treatment. *Mincey v. Arizona*, 437 U.S. 385, 389-401 (1978).

(Ex. O, p. 19.) A review of the transcripts supports the Court of Appeals' application of *Mincey*.

During the hearing on his motion to suppress the use of his urine sample at trial, Petitioner testified that the pain medication he was given was "just for the backache I had." (Ex. C., pp. 24-25 & 71.) Officer Aaron Aldridge, who was with Petitioner at the hospital, did not know that Petitioner was the driver of the Bronco involved in the wreck. (*Id*., p. 58.) He explained that his job "was basically to stand next to [Petitioner] during the entire time in the emergency room." (*Id*.) Officer Aldridge asked Petitioner what had happened and Petitioner told him that he was a passenger in the Bronco and that an individual named "Chris" was the driver. (*Id*.) After that conversation, Officer Aldridge, using a relaxed tone, and Petitioner made small talk about tattoos, Petitioner's life in Chicago, and his medical treatment. (*Id*., pp. 58-69.)

After Mr. Hawkins identified Petitioner as the driver, Officer Tim Reardon placed Petitioner under arrest and read him his *Miranda* warnings. (Ex. O, pp. 70, 75.) While interviewing Petitioner, Reardon, who knew Petitioner had been medicated, did not notice any outward signs affecting Petitioner's ability to communicate. (*Id*., p. 81.) He noticed some minor lacerations to Petitioner's extremities and his scalp, but Petitioner never indicated that pain was affecting his memory or his statements. (*Id*., p. 82.)

Officer Geena Stephens performed the drug recognition examination. (Ex. O, p. 78, 89.) After again discussing his *Miranda* rights, Officer Stephens conducted what she characterized as a "partial DRE exam." (Ex. O, p. 91.) She indicated that Petitioner's responses to her questions were appropriate, but that he did complain of back pain and Officer Stephens' impression was that "he was pretty banged up and he hurt all over," but she did not believe his condition affected his ability to answer her questions. (Ex. O, pp. 92-

- 17 -

93.) On cross-examination, Officer Stephens indicated she was aware that Petitioner had been given Xanax and Percocet, "but it didn't appears to be impairing his ability to speak with [her] and understand [their] conversation." (*Id.*, p. 94.)

Respondents have cited several cases that support the reasonableness of the State court's finding that, despite Petitioner's injuries and medications, his post-*Miranda* statements were voluntarily made. The Ninth Circuit cases make clear that a defendant can voluntarily waive his *Miranda* rights despite being in the hospital, on medication and in pain. *United States v. Lewis*, 833 F.2d 1380, 1384-85 (9th Cir. 1987) (finding statement voluntarily made even where defendant had recently returned from surgery, was in pain and had recently been administered a general anesthetic); *United States v. Martin*, 781 F.2d 671, 673-74 (9th Cir. 1985) (finding statements voluntary even though defendant in pain and under the influence of pain killer).

In this case, considering the facts reasonably determined by the Arizona Court of Appeals, the record establishes that Petitioner spoke voluntarily to Officers Reardon and Stephens. His rights were twice explained, and Petitioner indicated that he understood them and was nevertheless willing to talk. Although Petitioner was likely in some amount of pain as a result of his injuries from the collision, the injuries were not so severe as to "render him unconscious or comatose." *Martin*, 781 F.2d at 674; *see also Mincey*, 437 U.S. at 396 (statements involuntary where defendant unable to speak due to tube in his mouth and was intermittently losing consciousness). On this record, the Court cannot conclude that Petitioner's will was overborne and that his statements were involuntary.

### 4.    Ground V

Petitioner's Ground V arguments are that his due process and Sixth Amendment rights were violated when, during his sentencing hearing, the trial court a improperly permitted: (1) non-victim Marion Hawkins (the bus driver) to provide victim impact testimony; (2) victims and Hawkins to recommend that the maximum sentence be imposed; (3) untrue hearsay testimony from victims; and (4) hearsay testimony from officers regarding Petitioner's gang affiliations. As explained below, none of these claims merit relief.

In response to Petitioner's contentions that Mr. Hawkins should not have been permitted to testify and that the trial court improperly admitted hearsay testimony at his sentencing hearing, Respondents correctly assert that Petitioner raised these claims in state court as state-law questions which fall outside the realm of habeas review. Although Petitioner raised these claims in the Arizona Court of Appeals under a heading referencing due process and the Sixth Amendment, both arguments were based entirely on state law grounds and absolutely no mention of federal authority was raised.

With regard to Mr. Hawkins' testimony, Petitioner asserted his testimony was admitted in violation of a state statute, A.R.S. § 13-703.01(S)(2), and in support of his argument cited *State ex rel. Thomas v. Foreman*, WL 2005 2099800 (Ariz. App. 2005). The Court of Appeals described and addressed the argument as follows:

> Defendant argues that the trial court should not have allowed the bus driver to make a statement at the sentencing hearing as he was not a "victim" as defined by A.R.S. § 13-4401. Although the bus driver was not a victim as defined by the statute, there was no objection at trial. Defendant has provided no authority which required the trial court to prohibit the bus driver from speaking at the sentencing hearing, and we are aware of none. We find no fundamental error.

(Ex. O, pp. 21-22.)

Petitioner also contends that the state court impermissibly considered statements at his sentencing hearing that were hearsay, irrelevant, inflammatory, lacking foundation, and that evidence of his gang affiliation was admitted in violation of *Miranda*. In denying these claims, the Arizona Court of Appeals explained:

> We find no error in the consideration of this evidence. Defendant admitted his gang affiliation in his presentence report. Information in presentence reports may be considered to determine the existence of mitigating and aggravating circumstances. *State v. Carbajal*, 177 Ariz. 461, 463, 868 P.2d 1044, 1046 (App. 1994). Regarding defendant's assertion that this evidence constituted hearsay, hearsay evidence may be considered in the determination of the existence of aggravating and mitigating factors. *See State v. Marquez*, 127 Ariz. 3, 6, 617 P.2d 787, 790 (App. 1980). [FN 8: Contrary to defendant's assertions, not all evidence of defendant's gang affiliation was suppressed. Only defendant's pre-*Miranda* statements, which included statements about gang affiliation, were suppressed.]

(Ex. O, pp. 22-23.)

Each of these arguments was raised under state law, with the exception of Petitioner's claim that statements about his gang affiliation were admitted in violation of *Miranda*. Petitioner still has offered no federal authority supporting his contentions, but merely points out that he captioned this group of arguments with references to federal constitutional guarantees. The mention of those guarantees was insufficient to inform the state court that he was raising a federal constitutional claim. As the Ninth Circuit has explained:

> Our rule is that a state prisoner has not "fairly presented" (and thus exhausted) his federal claims in state court unless he specifically indicated to that court that those claims were based on federal law. *See Shumway v. Payne*, 223 F.3d 982, 987-88 (9th Cir. 2000). Since the Supreme Court's decision in *Duncan* [*v. Henry*, 513 U.S. 364 (1995)], this court has held that the petitioner must make the federal basis of the claim explicit either by citing federal law or the decisions of federal courts, even if the federal basis is "self-evident." *Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999) (*citing Anderson v. Harless*, 459 U.S. 4, 7, 103 S.Ct. 276, 74 L.Ed.2d 3 . . . (1982), or the underlying claim would be decided under state law on the same considerations that would control resolution of the claim on federal grounds. *Hivala v. Wood*, 195 F.3d 1098, 1106-07 (9th Cir. 1999); *Johnson v. Zenon*, 88 F.3d 828, 830-31 (9th Cir. 1996); . . . .

*Lyons v. Crawford*, 232 F.3d 666, 668-669 (9th Cir. 2000). Here, Petitioner cited no federal law or decision from the federal courts in either his state court briefing or the instant petition. Accordingly, this Court is prohibited from reviewing these claims.

As for his assertions that his gang affiliation was admitted in violation of *Miranda*, Petitioner has offered no facts or supporting authority that calls the state court's decision into doubt. Most important, he has not disputed that his gang affiliation was admitted in his presentence report and, assuming it was, how its use at sentencing violated *Miranda*. Given these shortcomings, there is little for this Court to evaluate in relation to this claim and there is no basis to find the state court's determinations unreasonable.

Petitioner's next claim under Ground V is that the victim's family members were improperly permitted at the sentencing hearing to offer inflammatory hearsay and request that Petitioner be sentenced to the maximum term of imprisonment, 27 years. Petitioner asserts

that these events violated his Sixth Amendment rights and, in support of his claims, cites the federal case of *Payne v. Tennessee*, 501 U.S. 808 (1991). (Ex. L, pp. 57-58.) Addressing this argument, the state court concluded that, "[r]egardless of whether this was proper, the trial court clearly disregarded these statements when it imposed presumptive sentences on all counts and did so in a manner that even the aggregate time served will be substantially less than the sentences sought by decedent's family. We find no fundamental error." (Ex. O, p. 22.) Respondents contend that this decision was neither contrary to, nor an unreasonable application of, the holdings of then-existing Supreme Court precedent.

While there is some authority that might be construed as supporting Petitioner's contentions, Petitioner has not cited and the Court is unable to find clearly established Supreme Court precedent that would lead the Court to the result he seeks. In *Booth v. Maryland*, 482 U.S. 496 (1987) the Supreme Court held that the admission of victim impact testimony at a capital sentencing constituted a per se Eight Amendment violation. *Payne v. Tennessee*, 501 U.S. 808, 830 n. 2 (1991), reversed that holding, but left in place the prohibition on opinions from family members about the crime, the defendant, and the appropriate sentence. However, it is not clear that the reservation of *Booth* made in *Payne* applies in cases non-capital cases such as Petitioner's. *Booth* and *Payne* expressly address the admissibility of victim impact evidence at a capital sentencing, prohibiting certain information on the grounds that it would lead a jury to impose a death sentence in a arbitrary and capricious manner. *Booth*, 482 at 502-03. As such, the holdings in *Booth* and *Payne,* at least insofar as they prohibit victim impact testimony as to the appropriate sentence in non-capital cases, are not clearly established federal law. 28 U.S.C. § 2254(d)(1), (2); *Huu Thanh Nguyen v. Garcia*, 477 F.3d 716, 727 (9th Cir. 2007) ("Absent a holding by the Supreme Court to apply the principles of *Wainright* and *Doyle* to competency hearings, we are bound by the strictures of AEDPA to defer to the state court's determination.")

Respondents also contend that there is no indication that the trial court improperly considered the victims' requests that the maximum sentence be imposed. The victims' sentencing recommendations uniformly called for the imposition of the maximum aggregate

27-year sentence. (Ex. K, pp. 13, 18-20 & 26.) However, the trial court rejected the victims' recommendations and instead ordered only two of the sentences to run consecutively, resulting in the imposition of an 18-year sentence. (*Id.*, p. 34.) Petitioner fails to note that while even the presentence report requested a 27-year sentence (*id.*, p. 27), the prosecutor requested an 18-year sentence, and on the record the court stated that, "I agree with [the prosecutor's] assessment as to an appropriate amount of punishment." (*Id.*) That the court rejected the recommendations of the victims and the PSR, and expressed agreement with the prosecutor's recommendation of an 18-year sentence, suggests that the Petitioner was not prejudiced by the victims' recommendations. Thus, even if the trial court was in error in allowing the victims to offer sentencing recommendations, there is nothing in the record to suggest that "the error had a substantial injurious effect on [Petitioner's] sentence. *Hoffman v. Arave*, 236 F.3d 523, 540 (9th Cir. 2001). Thus, any error was harmless. *Brecht v. Abrahamson*, 507 U.S. 619 (1993); *Washington v. Recuenco*, 548 U.S. 212 (2006) (holding that sentencing errors are subject to harmless error analysis). Petitioner is accordingly not entitled to relief on this claim.

### 5. Ground VI

In Ground VI, petitioner argues that his double jeopardy rights were violated because he was sentenced to consecutive sentences for convictions arising from one incident. In the first part of this claim, Petitioner explains that each of the charges stemmed from a single act "that happened in a tenth of a second." *Petition*, p. 10. This argument, as Respondents contend, carries no weight as "[i]t is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." *Albernaz v. United States*, 450 U.S. 333, 344 n.3 (1981).

Next, Petitioner claims that his rights were violated because "all the evidence is the same for all the offenses and it was impossible to commit the ultimate crime without committing the secondary crime." *Petition*, p. 10. The state court rejected this claim, finding it was not error to impose consecutive sentences "where a defendant has injured more than one person as a result of a single act." (Ex. O, p. 24 (citations omitted).) With the exception

of the Count 5 charge for leaving the scene of the accident, each count alleged against Petitioner in the indictment identifies a separate victim. (Ex. A, Item 1 (Count 1– Veronica Armenta; Count 2– Sonia Diaz; Count 3– Rosie Guerrero; Count 4– Victoria Armenta).)

In light of the clear distinctions among the five counts, Petitioner's convictions survive the *Blockburger* "same conduct" test. In *Blockburger,* the Supreme Court concluded that "the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not. " *Blockburger,* 284 U.S. at 304. Petitioner's convictions under Counts 1 through 4 required proof of separate victims, and his conviction on Count 5 required proof that he left the scene, which was not required of the other counts. Although Petitioner's conduct underlying Counts 1 through 4 may be identical, "the requirement of proof of disparate victims avoids any double jeopardy concerns." *Faulkner v. Schriro,* 2007 WL 2949053 at *15 (D.Ariz. Oct.9, 2007) (citations omitted) (rejecting double jeopardy claim where Arizona court imposed consecutive sentences for two counts of aggravated assault on police officers arising out of the same incident). *See also Riley v. Stewart,* 2005 WL 3434710 (D.Ariz. Dec.13, 2005) (denying habeas relief where Arizona court imposed consecutive sentences for each victim present during the course of one armed robbery) (*citing Missouri v. Hunter,* 459 U.S. 359, 368-369 (1983)); *LaMotte v. Slansky,* 661 F.Supp. 573 (D.Nev.1987) (rejecting double jeopardy claim where consecutive sentences were imposed for each victim killed or injured as a result of defendant's drunk driving). As such, Petitioner has presented no claim upon which he is entitled to relief.

## III.     RECOMMENDATION

Based on the foregoing, the Magistrate Judge **RECOMMENDS** that the District Court, after its independent review, **deny** Petitioner's Petition for Writ of Habeas Corpus [Docket No. 1].

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

1  Appellate Procedure, should not be filed until entry of the District Court's judgment.

2  However, the parties shall have ten (10) days from the date of service of a copy of this

3  recommendation within which to file specific written objections with the District Court. *See*

4  28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure.

5  Thereafter, the parties have ten (10) days within which to file a response to the objections.

6  If any objections are filed, this action should be designated case number: **CV 08-1106-PHX-**

7  **NVW**.   Failure to timely file objections to any factual or legal determination of the

8  Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of

9  the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

10  DATED this 10th day of February, 2010.

Jacqueline Marshall
United States Magistrate Judge

- 24 -